**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

FILED

00 MAY -3 PM 1: 24

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| **BURLINGTON INDUSTRIES, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Civil Action No. CV-97-S-2479-NE** |
| ) | |
| **MAPLES INDUSTRIES, INC.,** ) | **ENTERED** |
| ) | |
| **Defendant.** ) | **MAY  3 2000** |

**MEMORANDUM OPINION**

This action is before the court on a motion for summary
judgment filed by defendant, Maples Industries, Inc. (Doc. No. 31),
defendant's motion to strike certain evidence submitted in
opposition to summary judgment by plaintiff, Burlington Industries,
Inc. (Doc. No. 40), and plaintiff's motion to strike or dismiss
defendant's motion to strike (Doc. No. 44). Upon consideration of
the parties' briefs and relevant portions of the case file, this
court concludes that defendant's motion to strike is due to be
denied. Accordingly, plaintiff's motion to strike or dismiss is
due to be denied as moot. This court's conclusions regarding
defendant's motion for summary judgment are discussed *infra*.

**I. SUMMARY JUDGMENT STANDARD**

Federal Rule of Civil Procedure 56(c) provides, in relevant
part, that summary judgment not only is proper, but "shall be
rendered forthwith if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The movant bears the initial burden of showing the court, by reference to materials on file, that no genuine issues of material fact exist to be decided at trial. *See generally Celotex Corporation v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). The movant discharges this burden by showing the court there is an absence of evidence to support the non-movant's case. *See Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (*per curiam*). Rule 56 permits the movant to discharge this burden with or without supporting affidavits. *See Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. When the moving party has discharged its burden, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial. *See Jeffery*, 64 F.3d at 593.

In deciding whether the movant has met its burden, the court is obligated to draw all inferences from the evidence presented in the light most favorable to the non-movant and, also, to resolve all reasonable doubts in that party's favor. *See generally Spence*

2

*v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989).  Inferences in favor of the non-movant are not unqualified, however.  "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment."  *Resolution Trust Corporation v. Dunmar Corporation*, 43 F.3d 587, 592 (11th Cir. 1995) (citation omitted).  Moreover, evidence that is merely colorable, *see Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988), conclusory, *see Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989), or conjectural, does not create a genuine issue of material fact.

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment.  *See Augusta Iron & Steel Works v. Employers Insurance of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988).  A "genuine" dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Jeffery*, 64 F.3d at 594 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)).  The bottom line is "whether the evidence presents a sufficient disagreement to require submission

to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52, 106 S.Ct. at 2512.

## II. FACTUAL BACKGROUND

Burlington is a Delaware corporation; its principal place of business is in North Carolina. Maples is an Alabama corporation; its principal place of business is in Scottsboro, Alabama. Burlington and Maples compete nationally in the development, manufacturing, and marketing of textile carpeting material and rugs.

Bobby Vinson is a former employee of Burlington who began his employment with that company in 1979, as a wage employee electrician. He worked at one of Burlington's three plants in Monticello, Arkansas, which together composed the company's "House Area Rugs division." Vinson was promoted to the position of Maintenance Supervisor in 1984. As a condition of his promotion, Vinson was required to execute a so-called "Patent Agreement." The agreement provided, in relevant part, that:

> All improvements and inventions conceived or made by me during my employment which relate in any way to Burlington's business shall be disclosed promptly to Burlington and shall be its exclusive property. ... I also agree that without Burlington's permission I will not disclose or use any confidential or secret

4

information pertaining to its business.[1]

Tommy Hammil is another former employee of Burlington who began his employment with the company in 1987, as a project laborer. He worked directly under the supervision of Vinson.

At a quarterly management meeting in early 1990, Burlington's Executive Vice President, Mark Kay, displayed a yarn he had procured in Europe that he desired to copy. That yarn was "space dyed," which means that varying colors of dye were present at certain intervals along the strand of twisted threads. Vinson volunteered to attempt construction of a machine that would replicate the dye pattern. By September of that same year, Vinson (along with other Burlington employees) had arrived at a basic design. Burlington named the machine "Spectra." Vinson played a direct role in the design, construction, and testing of "Spectra." He acknowledged in deposition that Hammil also contributed to the project.

The following year, during August of 1991, and while still employed by Burlington, Vinson met with John Wade Maples, Jr., the President of defendant Maples Industries, Inc. Vinson explained the reason for meeting with the president of one of Burlington's

---

[1] Exhibit 17 to deposition of Bobby Vinson, attached as Exhibit 24 to plaintiff's evidentiary submission in opposition to summary judgment (Doc. No. 37).

competitors by saying that Burlington had promised him a raise, but he had not received it.   In other words, he was a disgruntled employee.   Accordingly, Vinson took three days of vacation time to travel to various textile plants in the states of Tennessee, Georgia, and Alabama, searching for other employment.   Vinson said he discussed the possibility of performing general maintenance work for John Wade Maples' company; Vinson represented that he was skilled at repairing "tufting" machines, which are used to sew carpet.   John Wade Maples demurred, telling Vinson that his company did not have tufting machines in need of repair, but that he would keep him in mind for future jobs.

Vinson was terminated by Burlington following his "vacation" (on August 22, 1991), for reasons unrelated to his attempts to secure employment with other textile companies.[2]   In connection with his exit from the company, Vinson signed a number of documents on August 23, 1991, including a "Reminder of Continuing Obligations under 'Employee Confidential Information and Patent Agreement.'"[3]

---

[2] Vinson stated in deposition that the reason given for his termination was that he "had used Burlington's people to do personal jobs and things for my own use." Vinson deposition at 69. Vinson said, however, that he "had used them to do a lot of favors for a lot of high up people in Burlington other than myself, and [he] took the rap for it." *Id.*

[3] Exhibit 26 to Vinson deposition. Burlington has failed to account for the distinction between the title of the original document signed by Vinson in 1984, entitled "Patent Agreement," and the title of this second document signed by Vinson in 1991, denominated a "Reminder of Continuing Obligations under 'Employee Confidential Information and Patent Agreement'" (emphasis supplied).

In pertinent part, that "reminder" provided:

> In connection with the termination of your employment
> from Burlington Industries, Inc., we wish to call
> attention to your continuing obligation under the
> "Employee Confidential Information and Patent Agreement"
> which you signed in connection with your employment with
> the Company.[4]
>
> This Agreement provides that following your employment
> you will not disclose or use any trade secrets or
> confidential information pertaining to the Company's
> business. ... The inventions conceived by you during the
> course of your employment relating in any way to the
> Company's business are the exclusive property of the
> Company.

Following his termination, Vinson received an "Innovation Award" from Burlington, "for the trade secret innovation [Burlington] identified as 'Improved Three Color Piece Dyed Rugs in Cut/Loop Construction.'"[5]   Vinson also was given a check in recognition of the award, which he declined to cash on the advice of an attorney.

Hammil and Jerry Webb, another Burlington employee who had worked under Vinson's supervision, resigned their employment during October of 1991.

Vinson, Hammil, and Webb then formed an Arkansas corporation and named it "Bobby Vinson & Associates, Inc." ("BVA").   BVA

---

[4] As noted on page 4 *supra*, Vinson actually signed the so-called "Patent Agreement" some five years after beginning his employment with Burlington, as a condition of promotion to the position of Maintenance Supervisor.

[5] Exhibit 28 to Vinson deposition.

submitted a proposal to Maples to build a tufting machine, which Maples accepted.   Maples furnished BVA a 20% down payment on May 12, 1992, and paid the remainder on October 26, 1992.

BVA also began the construction of space dyed yarn machines during 1992.   After selling two machines — to Rossville Yarns, located in Rossville, Georgia, and Color Spectrum, Inc., located in Lafayette, Georgia — Vinson asked John Wade Maples whether he would be interested in purchasing one.   During those discussions, Vinson informed Maples that he had assisted in the development of the "Spectra" space dyed yarn machines at Burlington.   John Wade Maples initially indicated he would not be interested, saying:

> There was one conversation in which he [Vinson] said he was moving forward with his plans to build a [space dyed] machine, and, again, wanted to know would I be interested.   And I explained to him that the reason I was not interested in that machine was because we were not interested in doing anything like Burlington was doing, that we did not want to be perceived as copying their product, and that we wanted to be more innovative than that. [6]

Even so, when John Wade Maples showed Vinson a type of chenille rug that he was interested in producing, Vinson indicated he might be able to modify a space dyed yarn machine to produce the necessary cording.   John Wade Maples told Vinson to "check back," if he

---

[6] Deposition of John Wade Maples, Jr., attached as Exhibit 14 to plaintiff's evidentiary submission in opposition to summary judgment, at 67.

successfully modified the machine.

Vinson eventually returned to the Maples plant with a yarn sample.   John Wade Maples confirmed the sample conformed to his expectations.     BVA then submitted a proposal to Maples for construction of two space dyed yarn machines on October 2, 1992. After receiving the proposal, John Wade Maples insisted that Vinson come to the Maples plant on October 19, 1992, to meet with him, Gerald Paulk, Maples' attorney, and Larry Bailey, Maples' Vice President of Production.   Attorney Paulk asked Vinson a number of questions during that meeting.    In proof of the old adage that lawyers make the worst witnesses, Paulk later recalled the conversation in the following, disjointed manner:

> Okay.   I think before -- I've got to back up a second because I think before I asked my questions, there was some general talk about -- I know that somewhere in there it came up that he had worked at Burlington.   And it may have been -- I believe it was something like this: That Wade may have said, "Tell Gerald a little bit about your background," and he said that he had worked at Burlington, that he was in maintenance, that he had been involved in maybe working on two or three different projects.

> I don't really specifically remember his saying space dyeing.   But that he had worked on different types of machinery, equipment, or whatever at Burlington.   And when that became known to me, I did ask him -- I'm not sure about the sequence, but I asked him at the time he left Burlington had he signed some type of -- I think probably said an employment agreement or an exit agreement; in other words, signed any kind of document

that would, I guess, prevent him from pursuing whatever his vocational callings were.

The way I looked at it was more of sort of like an anti-competition, I guess is what I had in my mind.  Did you, in terms of -- "Did you learn anything while you worked at Burlington that, you know, you couldn't go out there and use in any other business you were in?"

It wasn't a specific thing, it was just general. And he told me no, he had not signed anything. [7]

John Wade Maples, Paulk, and Bailey also learned during the meeting that Vinson had consulted a patent attorney in Little Rock, Arkansas, named Ron Carver, regarding his ability to create space dyed yarn machines in light of his work at Burlington.  Paulk subsequently verified the existence of a "Ron Carver patent attorney" in Little Rock, Arkansas, through the *Martindale-Hubbell Legal Directory*, but he did not write or telephone Carver, nor did he contact Burlington to verify Vinson's statement that he had not executed any agreements while employed by Burlington that would restrict his ability to construct and sell space dyed yarn machines.

Maples accepted BVA's proposal for the construction of two space dyed yarn machines.  Despite Vinson's verbal assurance that "he had not signed anything" during his employment with Burlington

---

[7] Deposition of Gerald Paulk, attached as Exhibit 17 to plaintiff's evidentiary submission in opposition to summary judgment, at 16-17 (emphasis supplied).

that would impact the transaction, Maples added the following provision to BVA's form contract:

> Seller [Vinson, as a representative of BVA] represents and warrants that he has the exclusive rights to the design manufacturing and sale of such dye machine and that no such rights have been transferred or assigned. Seller further agrees to indemnify and hold harmless Purchaser [Maples] from all claims and damages including court costs and attorney's fees, as a result of any legal action challenging Purchaser's rights to own or utilize the dye machine.[8]

Maples had not inserted such language into BVA's prior proposal relating to the construction of a tufting machine.

Vinson delivered the two machines to Maples in late December of 1992. Those machines were operational by April of 1993. BVA issued another proposal to Maples on March 29, 1993, for the construction of two additional space dyed yarn machines. Maples accepted the proposal on April 6, 1993, with the same warranty and indemnification language contained in the first contract. It paid the remaining balance owed BVA on June 11, 1993, which apparently was the same date on which those machines were placed in production.

Significantly, however, on May 5, 1993, Burlington's Senior Vice President and General Counsel, John Englar, had issued a cease and desist letter to Vinson. The letter reminded Vinson of the

---

[8] Exhibit 32 to Vinson deposition.

confidentiality agreements he had signed in 1984 and 1991, and demanded that he not only stop the production and sale of space dyed yarn machines, but also account for all machines previously sold.

During that same general time frame, Webb and Hammil purchased Vinson's interest in BVA and dissolved the corporation. They then formed a new company, "Universal Textile Machine Company" ("UTMC"). The attorney for Webb, Hamill, and UTMC responded to Englar's letter on June 1, 1993, denying any trade secret misappropriation and refusing to name the purchasers of BVA's space dyed yarn machines. Meanwhile, in May or June of 1993, Maples' attorney, Gerald Paulk, obtained a copy of Burlington's cease and desist letter to Vinson, which put Maples on notice that Vinson in fact had executed confidentiality agreements with Burlington.

Burlington brought suit for trade secret misappropriation against Vinson, Webb, Hammil, BVA, and UTMC in the United States District Court for the Eastern District of Arkansas on August 25, 1993. *See Burlington Industries, Inc. v. Bobby Vinson & Associates et al.*, No. LR-C-93-604 (E.D. Ark.). Shortly thereafter, on September 21, 1993, Robert A. Wicker, Burlington's Associate General Counsel, wrote Maples to notify it "that any carpet yarn

space dye machine sold by [Vinson, Webb, Hammil, BVA, or UTMC] is based upon trade secrets and confidential and proprietary information of Burlington and represents a misappropriation of such trade secrets and confidential and proprietary information." That letter further requested that Maples cease using the machines, or imparting information based on the use of such machines. Gerald Paulk responded to Wicker's letter on September 30, 1993; he stated that Maples would not cease using such machines until Burlington proffered "conclusive proof of [its] allegations." Wicker replied to Paulk's letter on October 12, 1993, by requesting that Maples inform Burlington of the number of space dyed yarn machines it had purchased from Vinson and related parties. Paulk did not respond to that letter. At no time during the exchange of these attorney communications did Maples stop using the four space dyed yarn machines purchased from BVA.

Vinson and BVA (the defunct corporate entity) entered into a consent decree and permanent injunction with Burlington on the eve of trial, March 21, 1994. That decree stipulated that Vinson, along with Hammil and Webb, had formed BVA, and that company had constructed machines that operated in the same manner as Burlington's "Spectra." It further noted that BVA had sold four of the machines to Maples. Trial commenced against the remaining

13

defendants, Webb, Hammil, and UTMC, on March 21st.   The Arkansas

district court entered a permanent injunction on September 22,

1994, which enjoined those defendants from

> (1) manufacturing, producing or building for sale,
> selling or offering to sell any equipment for the space
> dyeing of yarn which incorporates trade secrets or
> confidential information belonging to Burlington
> Industries, Inc.; and (2) disclosing in any manner any
> information in their possession and control relevant to
> the confidential and secret "Spectra" system for space
> dyeing yarn developed and/or used by Burlington
> Industries, Inc.

*Burlington Industries, Inc. v. Universal Textile Machine Company et*

*al.*, Civil Action No. LR-C-93-604 (E.D. Ark. 1993) (judgment,

memorandum opinion, and order entered on September 22, 1994, which

concluded that Burlington's "space dye machine process is a trade

secret for purposes of Ark. Code Ann. § 4-75-601 et seq.").   Maples

continued to operate its four space dyed yarn machines after entry

of the judgments against Vinson, BVA, Webb, Hammil, and UTMC.

Burlington commenced the present action against Maples on

November 3, 1994, also in the United States District Court for the

Eastern District of Arkansas.   On September 28, 1995, the Arkansas

district court entered partial summary judgment in favor of

Burlington, and preliminarily enjoined Maples from either

continuing to use the four space dyed yarn machines purchased from

BVA, or disclosing to others knowledge acquired through use of

14

those machines.   Only then did Maples cease its use of the machines.

Maples appealed the Arkansas district court's decision to the United States Court of Appeals for the Eighth Circuit, which reversed and remanded.  That court held that the Eastern District of Arkansas did not possess *in personam* jurisdiction over Maples. *See Burlington Industries, Inc. v. Maples Industries, Inc.*, 97 F.3d 1100, 1103 (8th Cir. 1996).  Following a tortuous path, including a second appeal to (and reversal by) the Eighth Circuit,[9] the Arkansas district court eventually transferred that action to this court pursuant to 28 U.S.C. § 1631, and it was docketed here as Civil Action No. CV-97-S-2479-NE.

Between the date Burlington initiated suit against Maples in Arkansas, and the date upon which the Arkansas district court ultimately transferred that action to this court, Burlington protectively filed a parallel action here.    *See Burlington Industries, Inc. v. Maples Industries, Inc.*, Civil Action No. CV-96-S-3214-NE (Smith, J.).  That complaint was filed on December 10, 1996, shortly after the Eighth Circuit's first decision, holding that the Eastern District of Arkansas lacked *in personam*

---

[9] *See Burlington Industries, Inc. v. Maples Industries, Inc.*, 121 F.3d 712 (8th Cir. 1997) (table).

jurisdiction over Maples.   The complaint protectively filed by Burlington in this court differed from the one originally filed in Arkansas principally in those portions alleging that Maples had violated <u>Alabama</u> (as opposed to Arkansas) law when misappropriating Burlington's trade secrets and intentionally interfering with its contractual relations.

In an order entered on November 26, 1997, this court granted Burlington's motion to consolidate Civil Action No. CV-96-S-3214-NE with the present action.[10]   In a memorandum opinion and order entered on March 27, 1998, this court also granted Burlington's motion to amend the complaint originally filed in Arkansas, for the purpose of adding claims arising under Alabama law.[11]   Once that motion was granted, Burlington voluntarily dismissed the complaint protectively filed as Civil Action No. CV-96-S-3214-NE.

Before the voluntary dismissal, however, Burlington had moved for partial summary judgment, contending that its prior judgments against Vinson, BVA, Webb, Hammil, and UTMC precluded Maples from arguing that technology associated with the space dyed yarn machines sold to Maples was not a Burlington trade secret.   This court applied Burlington's motion for partial summary judgment to

---

[10] *See* Doc. No. 6 in Civil Action No. CV-96-S-3214-NE.

[11] *See* Doc. Nos. 36 & 37 in Civil Action No. CV-96-S-3214-NE.

the present action.   In a memorandum opinion and order entered on
October 1, 1998 (Doc. Nos. 18 & 19), this court denied Burlington's
motion for partial summary judgment, finding that the judgments of
the Arkansas district court did not collaterally estop Maples from
disputing the status of Burlington's "Spectra" technology as a
trade secret under Alabama law.

### III. DISCUSSION

As the long and procedurally tortured history of this case
should indicate, Burlington's claims bottomed on Arkansas law are
not properly before the court.   The Eighth Circuit's conclusion
that the United States District Court for the Eastern District of
Arkansas lacked *in personam* jurisdiction confirms that Maples was
not subject to suit under the laws of that state.   Moreover,
Alabama's choice of law rules force this court to apply the law of
the state where the alleged tort occurred.   *See Fitts v. Minnesota
Mining & Manufacturing Company*, 581 So. 2d 819, 820 (Ala. 1991)
(applying "*lex loci delicti*" rule).   The torts at issue in this
case —— Maples' alleged misappropriation of Burlington's trade
secrets and intentional interference with contractual relations
between Burlington and Vinson —— occurred in Alabama, where Maples
negotiated, purchased, installed, and operated the space dyed yarn

machines manufactured by BVA.   Finally, the parties' failure to address Burlington's claims arising under Arkansas law, either when moving for or opposing summary judgment, further compels that conclusion.   Accordingly, Burlington's claims premised on Arkansas law are due to be dismissed.   *See Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); *see also Allstate Insurance Company v. Hague*, 449 U.S. 302, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981).   This court now turns to the claims bottomed on Alabama law.

## A.    The Alabama Trade Secrets Act

To succeed on its claim that Maples violated the Alabama Trade Secrets Act, Alabama Code § 8-27-1 *et seq.*, Burlington must prove that Maples acquired a "trade secret"[12] from Vinson, and "knew or should have known that (i) the information was a trade secret and

---

[12] The term "trade secret" is defined as "information that":

    a.    Is used or intended for use in a trade or business;
    b.    Is included or embodied in a formula, pattern, compilation, computer software, drawing, device, method, technique, or process;
    c.    Is not publicly known and is not generally known in the trade or business of the person asserting that it is a trade secret;
    d.    Cannot be readily ascertained or derived from publicly available information;
    e.    Is the subject of effort that are reasonable under the circumstances to maintain its secrecy; <u>and</u>
    f.    Has significant economic value.

Ala. Code § 8-27-2(1) (emphasis supplied).  *Nota bene* that the conjunctive "and" means Burlington must prove each element by a preponderance of the evidence.

(ii) that the trade secret had been appropriated" by Vinson through a breach of confidence. Ala. Code § 8-27-3(3). Upon consideration of the elements of the claim and certain material evidence submitted by the parties, this court finds that summary judgment is not appropriate, due to the existence of genuine issues of material fact. Such issues of fact include, but are not limited to, whether Burlington's "Spectra" technology: "[i]s not publicly known and is not generally known in the trade or business of the person asserting that it is a trade secret;" "[c]annot be readily ascertained or derived from publicly available information;" and "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *See* Ala. Code § 8-27-2(1)(c)-(e). Should Burlington establish that its "Spectra" technology is in fact a trade secret as defined by Alabama law, an additional issue to be resolved by the fact finder concerns whether Maples <u>knew or should have known</u> that Vinson appropriated that trade secret from Burlington by a breach of confidence. *See id*. § 8-27-3(2)-(3).

**B.   Intentional Interference with Contractual Relations**

On the other hand, upon consideration of Burlington's claim that Maples tortiously interfered with plaintiff's contractual and business relations and all material evidence relating thereto, this

19

court finds that summary judgment is appropriate.

To recover on such a claim under Alabama law, a plaintiff must prove: (1) the existence of a contractual or business relationship; (2) defendant's knowledge of such relationship; (3) intentional interference by defendant with the relationship; and (4) damages to plaintiff as a result of defendant's interference. *See Barber v. Business Products Center, Inc.*, 677 So. 2d 223, 227 (Ala. 1996); *Joe Cooper & Associates, Inc. v. Central Life Assurance Company*, 614 So. 2d 982, 986 (Ala. 1992). "Additionally, plaintiffs must produce substantial evidence of fraud, force, or coercion on the defendant's part." *Barber*, 677 So. 2d at 277. *See also Powell v. South Central Bell Telephone Company*, 361 So. 2d 103, 106 (Ala. 1978) (affirming dismissal of plaintiff's claim of intentional interference with employment relationship, because facts revealed no coercive, forceful, or unlawful conduct by defendant). Finally, justification is an affirmative defense, which must be pled and proved by the defendant. *See Gross v. Lowder Realty Better Homes and Gardens*, 494 So. 2d 590, 597 n.3 (Ala. 1986); 1 *Alabama Pattern Jury Instructions — Civil* 10.36, at 211-12 (2d ed. 1993).

Burlington contends that Maples, by purchasing the four space dyed yarn machines from BVA, intentionally interfered with the

20

"Patent Agreement" and "Reminder of Continuing Obligations under 'Employee Confidential Information and Patent Agreement'" between Vinson and Burlington.  Such a claim cannot stand in light of the facts set out above.  Assuming for purposes of this motion that adequate consideration supported the most recent of such agreements between Burlington and Vinson, the facts reflect that Burlington still cannot establish the second and third elements of the claim, or show coercive, forceful, or fraudulent conduct by Maples.

It is undisputed that Vinson repeatedly approached John Wade Maples, soliciting his interest in BVA's space dyed yarn machines. Despite Mr. Maples' initial lack of enthusiasm, Vinson persisted. Maples' representatives (John Wade Maples, Paulk, and Bailey) were under the impression Vinson had not executed any agreements with Burlington that impeded his ability to construct and sell such machines.  While Maples and its attorney may have been negligent in failing to investigate the veracity of Vinson's statements, that cannot lead to the imputation of actual knowledge in an arms length transaction.  Further, there is no evidence in the record that Maples intended to interfere with any contract entered into between Burlington and Vinson at the time of purchase.  Finally, there is no evidence on the record of fraud, force, or coercion exhibited by Maples in its dealings with Vinson.

In sum, the burden of proof that Burlington must satisfy in establishing that Maples intentionally interfered with contractual relations is much more stringent than the burden of proof associated with Burlington's misappropriation of trade secrets claim.   As to trade secret misappropriation, Burlington must show Maples was <u>negligent</u> in failing to discern that Vinson had appropriated Burlington's trade secret by a breach of confidence. As to intentional interference with contractual relations, on the other hand, Burlington must show Maples acted <u>knowingly, willfully, and intentionally</u> when interfering with the contractual relationship between Vinson and Burlington.   It is this higher bar that Burlington fails to clear; and it is this distinction regarding the standard of proof that accounts for this court's decision to dismiss Burlington's intentional interference claim, yet retain its misappropriation of trade secrets claim for trial.

### IV. CONCLUSION

In sum, the only claim that will proceed to trial involves Burlington's allegation that Maples violated Alabama law by misappropriating its trade secrets.   Burlington's claims premised on Arkansas law, as well as its intentional interference with contractual relations claim grounded in Alabama law, are due to be dismissed.   An order consistent with this memorandum opinion shall

22

be entered contemporaneously herewith.

DONE this **3**rd day of May, 2000.

_____
United States District Judge